UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| G. ASHLEY,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>MICHAEL RAY MOORE, *et al.*,<br><br>　　　　　　　Defendants. | Case No. CV 22-4909-DMG (KSx)<br><br>**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [159]** |

Before the Court is a Motion for Summary Judgment ("MSJ") filed by Defendants Michael Moore, Justin Peters, Edgar Muro, Kristopher Clark, Nicholas Chacon, Ben McPheeters, Jeritt Severns, Vicente Lopez, Ivan Guillermo, Ruben Chavez, Armando Hoyos, James Zourek, and David Christenson. [Doc. # 159.] The MSJ is fully briefed. [Doc. ## 162 ("Opp."), 165 ("Reply").] For the following reasons, the Court **GRANTS** the MSJ.

## I.
## PROCEDURAL BACKGROUND

Plaintiff G. Ashley filed the instant action on July 18, 2022. [Doc. # 1.] In the operative First Amended Complaint ("FAC") [Doc. # 76], Ashley asserts claims for: (1) unreasonable search and seizure of his person under 42 U.S.C. section 1983; (2) conspiracy

to violate his Fourth and Fourteenth Amendment rights under Section 1983; (3) *Monell* municipal liability under Section 1983; (4) conspiracy to interfere with civil rights under 42 U.S.C. section 1985; (5) "interfering with plaintiff's federal constitutional right of access to the federal courts" under Section 1983; (6) violation of *jus cogens* international law; (7) violation of *jus dispositivum* international law; (8) malicious prosecution under Section 1983; and (9) liability under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In the instant MSJ, Defendants seek summary judgment on Ashley's claims in their entirety or, in the alternative, partial summary judgment. MSJ at 2–6.[1]

## II.
## FACTUAL BACKGROUND

### A. Evidentiary Objections

The facts in this section are uncontroverted, unless otherwise stated. Many of the parties' purportedly disputed facts are not in fact controverted by the evidence, and the Court therefore cites to them as uncontroverted facts. Facts are drawn from Defendants' Statement of Undisputed Facts ("DSUF") [Doc. # 159-1], as set forth in their Reply [Doc. # 165-1], as well as Ashley's Statement of Genuine Disputes [Doc. # 162-1] and responses in his Opposition. The Court has reviewed the entire record, but only discusses the uncontroverted material facts that are necessary to or affect its analysis.

The Court has also reviewed the parties' evidentiary objections. [Doc. ## 162-3, 165-4, 165-5, 165-6]. Ashley objects to Defendants' expert declaration by police practices expert Edward T. Flosi, on the basis that "all of the material facts are apparent, from testimony and body-cam footage" and that Flosi's opinions improperly go to legal issues. [Doc. ## 159-14 ("Flosi Decl."), 162-3.] The Court **OVERRULES** both objections. There is no rule prohibiting expert testimony in a case where there is also bodycam footage. While Flosi may not provide an opinion on a legal conclusion in the case, an expert opinion

---

[1] All page citations herein refer to the page numbers inserted by the CM/ECF system. Video and audio exhibits lodged with the Court are cited by timestamp.

"is not objectionable just because it embraces an ultimate issue." *See* Fed. R. Evid. 702, 704; *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("As a rule, an expert witness "cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law."). Here, the cited portion of Flosi's declaration, *see infra* Part IV.B.2, is permissible expert testimony based on Flosi's knowledge of LAPD policies and practices. *See* Flosi Decl. ¶¶ 108–18.

Since it did not rely on any other objected-to evidence in reaching its opinion, the Court **OVERRULES** these objections as moot. Ashley's Request for Judicial Notice [Doc. # 162-8 ("RJN")] is **GRANTED** for the limited purpose of indicating what information was in the public realm, although none of its exhibits create a genuine dispute of material fact. *See* RJN Opp. [Doc. # 165-3]; *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002); Fed. R. Evid. 201.

**B.    Facts of Case**

On September 9, 2019, around 8:00 p.m., Los Angeles Police Department ("LAPD") Officers Muro and Peters were patrolling in the "Metropolitan Division" when they noticed Ashley's white Toyota Camry driving southbound on Broadway Boulevard with high beams and tinted windows.[2] DSUF 1, 3, 4. They began to drive behind the vehicle and noticed that the rear license plate light was also out, amounting to three observed California Vehicle Code violations. DSUF 5, 6. They decided to stop the vehicle and issue a citation. DSUF 6.

To initiate the traffic stop, Peters activated the vehicle's red light and siren. DSUF 8; Peters Decl., Ex. A ("Peters BWC Footage") at 2:16–49 [Doc. # 159-2]. The Camry pulled over to the west side of Broadway, south of West 87th Street. DSUF 9. Once the Camry pulled over, Peters stepped out of the car and ordered Ashley to "roll down all [his]

---

[2] Muro and Peters attest that they did not observe Ashley's physical characteristics before stopping him. Decl. of Justin Peters ISO MSJ ¶ 10 [Doc. # 159-2 ("Peters Decl."); Decl. of Edgar Muro ISO MSJ ¶ 10 [Doc. # 159-3 ("Muro Decl.")].

windows" and step outside to the sidewalk for officer safety. Peters BWC Footage at 2:40–5:40. Ashley refused to do so initially, but ultimately he complied. *Id.*

After Ashley moved to the sidewalk, Peters exited his vehicle and shined his flashlight through the vehicle's rear left window to check for other passengers. *Id.* at 6:22–39. When Peters approached Ashley on the sidewalk, Ashley appeared upset, repeatedly asked Peters why he was stopped, and stated that he believed his stop and detention was pretextual racial profiling. *Id.* at 6:45–8:56. During this exchange, Officers Chacon and Clark arrived on the scene. DSUF 25; *see also* Peters BWC Footage at 8:29.

The confrontation continued for several minutes, with Ashley refusing to comply with orders from Peters and Chacon to turn around and face the wall and cooperate with their investigation. *See id.* at 8:20–10:00. Eventually, Peters warned Ashley that they would likely use "reasonable force" to detain him and put him in handcuffs or use a taser on him if he continued to refuse cooperation, "and it will hurt." *Id.* at 10:20–32. Ashley continued to say that he believed his stop to be unlawful and he wanted to wait for a police sergeant. *Id.* at 10:20–11:00. Moments later, Peters and Chacon grabbed Ashley and attempted to handcuff him. DSUF 43, 44, 44a. Ashley resisted them, and Officer Clark fired his taser at him and then a three-point-drive stun. *See* Decl. of Kristopher Clark ISO MSJ, Ex. A (Clark BWC Footage) at 5:30–55 [Doc. # 159-4]. After the stun, Peters and Chacon were able to place handcuffs on him. DSUF 50. Officer Muro placed a "hobble device" on Ashley's legs as well. DSUF 52; Decl. of Muro ISO MSJ, Ex A (Muro BWC Footage) at 12:24–13:10 [Doc. # 159-3]. After handcuffing Ashley, the officers placed him under arrest and removed the hobble device once he was secured. DSUF 53; Muro BWC Footage at 13:15–14:20.

While Chacon and Peters were arresting Ashley, Officer Christensen looked inside the window of his Camry with a flashlight and observed three bottles on the passenger seat: one labeled "Promethazine Hydrochloride and Codeine Phosphate Syrup," and two unlabeled clear plastic bottles containing red liquid. DSUF 57, 58; Decl. of David Christensen ISO MSJ, Ex. A (Christensen BWC Footage) at 2:08–18 [Doc. # 159-13

("Christensen Decl.")]. He immediately informed McPheeters of this observation, and Clark and McPheeters conducted a search of his front and rear passenger areas for contraband. DSUF 61; Christensen BWC Footage at 2:28–30, 4:01–11:20; Decl. of McPheeters ISO MSJ, Ex. A (McPheeters BWC Footage) at 8:40–13:36. This search yielded multiple crystalline substances and a pipe with a bulb, consistent with methamphetamine and related paraphernalia. *See id.*; DSUF 63. McPheeters then searched the trunk, and discovered a Glock gun box with a loaded semi-automatic pistol and a high capacity magazine. DSUF 65; McPheeters BWC Footage at 13:40–16:22.

## C.   Video Evidence

In support of their MSJ briefing, the parties each lodged video exhibits with this Court, the authenticity of which are generally undisputed. These exhibits include body-worn camera footage from Chacon, Chavez, Christensen, Clark, Guillermo, McPheeters, Muro, Peters, Zourek, and Severns, as well videos depicting the investigation of this incident. [Doc. ## 160, 162-10.] These videos depict many material events in this case, shedding light on the conduct of the defendants at various times.

When confronted with a videotape of the events in question, the Court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by [the video], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Indeed, for some of the interactions between Ashley and Defendants, the videos may obviate any genuine disputes of material fact as to what occurred in those interactions. "In the absence of material factual disputes, the objective reasonableness of a police officer's conduct is 'a pure question of law.'" *Lowry v. City of San Diego*, 858 F.3d 1248, 1254 (9th Cir. 2017) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).

# III.
# LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

# IV.
# DISCUSSION

**A.    Failure to Oppose**

Ashley's Opposition does not respond to most of the arguments Defendants put forth in their summary judgment motion. "[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or

abandonment in regard to the uncontested issue." *See Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011). The Court therefore **GRANTS** Defendants' MSJ, for failure to oppose, as to Ashley's claims for conspiracy under Sections 1983 and 1985, his Section 1983 malicious prosecution claim, his international law claims, and his RICO claim. The only claims that Ashley addresses in his Opposition are his individual Fourth Amendment claim, *Monell* claim, and interference with right of access to the courts, so the Court discusses them below.

**B.      Fourth Amendment**

Under 42 U.S.C. section 1983, a plaintiff may bring a civil action for the deprivation of constitutional rights by an individual acting under color of state law.[3] 42 U.S.C. § 1983; *see Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014) ("Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights."). The two essential elements of a Section 1983 claim are that the defendant acted under color of law, and his conduct deprived the plaintiff of a constitutional right. *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011). Even when a constitutional violation has occurred, however, state officers are entitled to qualified immunity from a Section 1983 action unless the unlawfulness of their conduct was "clearly established" at the time. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018).

As a threshold matter, Ashley does not present evidence as to each individual Defendants' role in the constitutional violations he alleges. *See* Reply at 13–14. Instead, he offers a general discussion of the "integral participation" doctrine, to further a position that "all defendants are liable as 'integral participants' in what befell plaintiff." Opp. at 23. Ashley's failure to specify which officers took what actions that led to Ashley's injury, let alone provide evidence of the same, is inadequate. *See Harper v. City of L.A.*, 533 F.3d 1010, 1026 (9th Cir. 2008) (plaintiff must demonstrate causation to fulfill the elements of

---

[3] It is undisputed that each defendant acted under color of state law in all the events giving rise to this case.

a Section 1983 claim). The Court is not obligated to "comb the record" to piece that together on his behalf. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *see also* Fed. R. Civ. P. 56(c)(3) ("district courts need consider only the cited materials").

### 1. Initial Stop

On the merits, Ashley argues that the initial stop was unconstitutional. Opp. at 24. According to Ashley, the fact that certain state charges were dismissed should be dispositive. *See id.* at 22. Not so. Ashley does not deny that he was driving with high beams and tinted windows in violation of California Vehicle Code sections 24409 and 26708, and that his license plate light was out. DSUF 4, 6–8. In fact, he readily admits to the same in the video footage. *See* Peters BWC Footage at 8:20–10:00 (Ashley explaining, *inter alia*, why his license plate light was out). According to Defendants, "the area where the subject incident occurred is a high crime area." *See* Muro Decl. ¶ 5; DSUF 3. The stop occurred at nighttime in a dimly lit area. DSUF 4, 9.

Under these circumstances, there is no reasonable dispute that the officers had probable cause to conduct the initial traffic stop, and that it was lawful for the officers to request that Ashley exit the vehicle for safety reasons. *See United States v. Williams*, 418 F.3d 1029, 1033–34; *see also Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169–70 (9th Cir. 2011) (affirming that police may direct movement of people involved in lawful traffic stop to limit risk of danger). As a matter of law, Ashley's initial stop did not violate the Fourth Amendment.

### 2. Vehicle Search

Nor can Ashley establish a genuine dispute of material fact that the search of the passenger area of the vehicle was unconstitutional. *See* Opp. at 24. The bottle of codeine and two unlabeled bottles with red liquid were in plain view on his front passenger seat. DSUF 57, 58; Christensen BWC Footage at 2:08–18. Officer Christensen's unrebutted testimony is that based on his training and experience, he reasonably believed that the liquid was consistent with codeine, and knew that codeine and promethazine are used

unlawfully as recreational drugs. *See* Christensen Decl. ¶ 7. Ashley's declaration does not address the bottles in any way nor dispute Christensen's account of discovering them. *See generally* Decl. of G. Ashley ISO Opp. [Doc. # 162-6 ("Ashley Decl.")].

This discovery, in plain view, gave the officers probable cause to search the vehicle for more contraband. *See Texas v. Brown*, 460 U.S. 730 (1983) (plain view doctrine applied when officer shined flashlight into vehicle pursuant to lawful stop and saw contraband); *see also United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015) (the "automobile exception" allows police officers to conduct a warrantless vehicle search if they have probable cause to believe it contains contraband); *United States v. Yoon*, 751 F. Supp. 161, 167 (D. Haw. 1989) (suspicious object in plain view on passenger seat of vehicle in lawful traffic stop gave rise to probable cause to search vehicle).

Where the assertion of probable cause gets more attenuated is when Officer McPheeters decided to extend the search to the vehicle's trunk. *See* DSUF 65; McPheeters BWC Footage at 13:40–16:22. Officers may search the trunk of a lawfully stopped car *only if* probable cause justifies extending the search to that area. *See United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *United States v. Diaz-Sanchez*, -- F. Supp. 3d --, 2023 WL 6122718, at *6 (D. Or. Sept. 19, 2023) ("Trooper Miller had probable cause to believe that Defendant's car contained contraband and evidence related to the unlawful importation of marijuana. Thus, the trooper's search of Defendant's car, including the trunk and its containers, was lawful."); *United States v. McCoy*, 398 F. Supp. 617, 623 (N.D. Cal. 2019) (warrantless search of trunk did not violate Fourth Amendment where "there was a fair probability that contraband or evidence of a crime" would be found there).

While McPheeters articulates a relatively generic reason that he believed probable cause extended to Ashley's trunk, Ashley does not refute his statement. *See* Decl. of Ben McPheeters ISO MSJ ¶ 9 ("I believed Mr. Ashley's trunk may contain [sic] additional contraband based on the totality of the circumstances I was apprised of prior to opening it

and what we had uncovered in Plaintiff's vehicle."). [Doc. # 159-6 ("McPheeters Decl.")]. Defendants also offer expert testimony by Flosi, which states his opinion that "[d]ue to the size of the[] bottles, a reasonable officer would conclude that more of such contraband could be located within the passenger compartment and/or the trunk of the vehicle." Flosi Decl. ¶ 113. This evidence satisfies Defendants' burden of production, and Ashley does not adduce any specific evidence or argument to contest it. *Cf. Celotex Corp.*, 477 U.S. at 323.

Since there is no dispute that the suspected codeine was in plain view through the car window, and the search of the vehicle was conducted only after Officer Christensen noticed the bottles, the Court concludes that there is no triable issue of material fact as to whether Christensen and McPheeters' vehicle search violated the Fourth Amendment. Summary judgment is **GRANTED** on this aspect of Ashley's claim as to all Defendants.

### 3. Excessive Force

#### a. Constitutional Violation

Courts analyze excessive force claims under the Fourth Amendment's "objective reasonableness" standard. *Brooks v. City of Seattle*, 599 F.3d 1018, 1025 (9th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The reasonableness determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted).

Courts in the Ninth Circuit employ a three-step analysis in evaluating excessive force claims. The first step is to assess the severity of the intrusion on the plaintiff's Fourth Amendment rights based on the type and amount of force inflicted. Next, a court must evaluate the government's interests in light of the three "*Graham* factors": (1) the severity of the crime; (2) the threat posed to officers or bystanders; and (3) any resistance to arrest and risk of flight. Finally, a court must balance the gravity of the intrusion on the plaintiff against the government's need for the intrusion. *Espinosa v. City and County of San*

*Francisco*, 598 F.3d 528, 537 (9th Cir. 2010); *see also Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003).

First, the Court looks to the nature and quality of the force used against Ashley: a taser and a "three-point drive stun." DSUF 50; *see also* Clark BWC Footage at 5:30–55. Courts in the Ninth Circuit recognize that the discharge of a taser and/or stun gun involve "an intermediate level of force with 'physiological effects, [] high levels of pain, and foreseeable risk of physical injury.'" *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010)); *see also, e.g.*, *Estate of Adkins, by and Through Adkins v. Cnty. of San Diego*, 384 F. Supp. 3d 1195, 1202 (S.D. Cal. 2019) (discussing use of taser as "intermediate" use of force); *Hesterberg v. United States*, 71 F. Supp. 3d 1018, 1035 (N.D. Cal. 2014) (same).

Next, the Court turns to the question of whether the governmental interests at stake justify the use of this force against Ashley. With respect to the severity of the crime, the events of this case began with a traffic stop for Vehicle Code violations—certainly not a serious crime providing a strong government interest. DSUF 5, 6; *see J.P. ex rel. Balderas v. City of Porterville*, 801 F. Supp. 2d 965, 981 (E.D. Cal. 2011) (noting that "typical" misdemeanor Vehicle Code violations "[g]enerally . . . do not justify significant uses of force" without aggravating circumstance giving rise to an increased governmental interest). Even though the vehicle search yielded evidence of more serious crimes, there is no evidence that Clark was aware of any contraband or firearms found in Ashley's car when he fired his taser. *See* Clark BWC Footage at 2:14–5:55. In fact, the audio of Clark's bodycam footage reflects that someone in earshot clearly stated that Ashley "hasn't been searched yet" in the moments before Clark tased him. *Id.* at 3:52–54.

Even though Ashley refused to comply with the officers' verbal commands, there is no evidence that Ashley was likely to harm himself or the officers. Review of the bodycam footage shows that Ashley engaged in a verbal confrontation with the officers, but at no point does he threaten them, indicate that he has a weapon of any kind, or attempt to evade them. There were many officers present at the scene, who could have easily overpowered

him if he tried to escape. When the situation begins to escalate, the officers attempt to handcuff him but there is no clear view in any of the videos of what exactly he is doing. At some point, one of the officers yells at Ashley to "stop reaching for [his] waistband," and Ashley responds that "I ain't reaching for nothing." *See* Clark BWC Footage at 5:10–13; Peters BWC at 11:19–22. Indeed, Ashley repeatedly says that he just wants to know why he is being detained for a Vehicle Code violation, asserts that the officers' conduct "is against my rights," and asks to speak to a sergeant. *See, e.g.*, Muro BWC Footage at 9:56–10:20; Chacon BWC Footage at 3:00–05, 53–55. Throughout this confrontation, the officers say they intend to "deescalate," but also repeatedly threaten to tase him and tell him they are going to handcuff and arrest him. *See* Clark BWC Footage 4:52–56 ("Hey, listen, listen. If you don't cooperate, you're going to get tased. That's what's going to happen."); Peters BWC Footage at 10:31–12:02.

The final "governmental interest factor" examines whether Ashley "was actively resisting arrest or attempting to evade arrest by flight." *See Mattos v. Agarano*, 661 F.3d 433, 449–50 (9th Cir. 2011). According to Ashley, he did not "aggressively resist or forcefully attempt to break free" nor did he do anything "that reasonably [could] have caused Clark to fear that [he] would break away or would inflict any bodily injury," and he "never resisted at all, much less did . . . physically or forcefully resist." Ashley Decl. ¶¶ 44, 44a, 46.

This account is contradicted by the videos, which clearly show that a physical struggle began between Ashley and some officers and that he was resisting arrest. *See* Clark BWC Footage at 2:14–5:55. But there is no clear depiction on any of the videos of the precise moment before Clark used his taser on Ashley. *Cf. S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) (the court must consider the "danger a suspect poses *at the time force is applied*") (emphasis added). While Ashley was non-cooperative with the officers' commands and resisted arrest, there is a genuine dispute as to whether—in the moment Officer Clark used his taser—its use was excessive given the number of officers present and the other lower level of force being used to handcuff him.

Based on this evidence, and viewing the facts in the light most favorable to Ashley, a reasonable juror could find that Officer Clark's use of a taser on Ashley constituted excessive force. Summary judgment is **GRANTED** to all Defendants, but **DENIED** as to Officer Clark on the constitutional violation.

### b.   Qualified Immunity

To defeat the defense of qualified immunity, Ashley must show that Clark's conduct is clearly established as unlawful, even viewing the evidence in the light most favorable to Ashley. *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017), *cert. denied sub nom. Shafer v. Padilla*, 138 S. Ct. 2582 (2018). Demonstrating that the unlawfulness of an officer's actions was "clearly established" requires a showing that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 62–63; *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1118 (9th Cir. 2017). Ashley does not meet his burden to do so here.

A clearly established right cannot merely be implied by precedent, and plaintiffs may not defeat qualified immunity by describing violations of clearly established general or abstract rights outside "an obvious case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004)). In fact, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

Nonetheless, the standard does not "require a case directly on point for a right to be clearly established," so long as "existing precedent" places "the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 580 U.S. at 79). Specifically in the excessive force context, the Supreme Court has clarified that "in an obvious case, the standards set forth in *Graham* and *Garner*, though cast at a high level of generality, can clearly establish that a constitutional violation has occurred even without a body of relevant caselaw." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (*per curiam*) (internal quotation marks and citations omitted); *see also Estate of Aguirre v. Cnty.*

*of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (affirming denial of qualified immunity in "obvious case" of excessive force where individual "posed no immediate threat" to officers).

The Court notes that at a high level of generality, it is clearly established that "officers who confront . . . resistance are only permitted to use an amount of force that is reasonable to overcome that resistance." *Barnard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013); *see also Graham*, 490 U.S. at 396; *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). It is clearly established in the Ninth Circuit that "using a Taser constitutes *some* level of force." *See Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1177 (9th Cir. 2013) (citation omitted). Here, Ashley had been verbally resisting arrest and had not yet been patted down. DSUF 29. The officers repeatedly warned him that reasonable force might be necessary if he did not cooperate, including use of a taser. *See* Clark BWC Footage 4:52–56; Peters BWC Footage at 10:31–12:02. While the moment of the tasing is not shown on the bodycam footage, there was a physical scuffle during which it was not clear whether Ashley would inflict injury upon the officers by his persistent failure to comply with officer directives and submit to arrest. *Id.*

Even viewing the facts in the light most favorable to Ashley, in addition to the video evidence, it does not appear to be "clearly established" that Officer Clark's use of a taser to subdue him in that situation would violate Ashley's Fourth Amendment rights. *Cf. Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 949–50 (9th Cir. 2017) (concluding qualified immunity applied where officer used taser against individual who physically resisted arrest). Ashley's Opposition recites a litany of generic case law on qualified immunity and the summary judgment standard, but does not cite any caselaw that speaks directly to the specific facts of this case.he fails to meet his burden to show that there are triable issues of material fact, which when construed in his favor could give rise to liability. *See* Opp. at 9–11; *cf. Roberson v. City of Hawthorne*, 2023 WL 2596834, at *2–3 (9th Cir. Mar. 22, 2023) (affirming denial of qualified immunity where an officer did not have

probable cause for arrest of a plaintiff who defied officer directives, gave no prior warning of use of force, and failed to use less violent means of effecting arrest).

Accordingly, the Court **GRANTS** summary judgment to Officer Clark on the basis of qualified immunity.

C. *Monell* **Liability**

Ashley counters Defendants' request for summary judgment on his *Monell* claim with a threadbare response. *See* Opp. at 28. Indeed, he says that Moore is "potentially liable" but does not present any evidence or argument that might show any unlawful custom, policy, or practice beyond a general recitation of the caselaw, nor that Moore's conduct was the "moving force" behind any alleged violations. *See* MSJ at 33–34; Opp. at 25–26. He provides an excerpt from Moore's deposition testimony, which only states that the officer's actions were consistent with the Los Angeles Police Department's customs and policies in very general terms. Opp. at 28. This is insufficient to defeat summary judgment.

Ashley fails to demonstrate the potential existence of necessary elements of his *Monell* claim. Summary judgment as to the *Monell* claim therefore is **GRANTED**.

D. **Right of Access to the Courts**

Ashley seems to make this argument under the motion to dismiss standard, rather than the summary judgment standard. *See* Opp. at 26–27 (arguing that his Count Five "states a claim" and that "a court should find that a claim for denial of access to the courts has been stated"). He does not provide a single citation to the record in this section, nor does he even specify which actions of which defendants purportedly denied Ashley his access to the courts. *Id.* Because Ashley has not established a triable issue of fact, the Court **GRANTS** summary judgment to Defendants on this claim.

//
//
//

-15-

# V.
# CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' MSJ.[4]  Defendants' *ex parte* application to modify the scheduling order [Doc. # 171] is **DENIED** as moot. Judgment shall issue in favor of Defendants.

**IT IS SO ORDERED.**

DATED:  February 19, 2024

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

---

[4] The Court need not address Ashley's request for a "Chuman Certification" at this time.  [Doc. ## 162-9, 165-7.]  Since no appeal has yet been filed, the request is premature.  *See Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir. 1992).